You may remove your mask if you wish, but you don't have to, Your Honor. Good morning, Your Honor. As the mayor pleased to court, I wish to reserve five minutes for rebuttal. I look forward to answering your questions. The crux of this case is that the FAA admits that it conducted no environmental analysis of Harries II or SLAP I, subsequent to 2016 Metroplex EA Fonzie. This despite the record clearly showing both that the FAA made substantial changes to proposed action and the occurrence of significant new circumstances or information that are relevant to environmental concerns, which of course are the legal triggers for supplemental deep analysis under FAA Order 1050.1f. Under FAA's own standard, even though there is merely information itself, this would trigger the requirement of FAA staff. Can you move the microphone a little closer to you, a little bit? Yes, thank you, Your Honor. Is that better? That's much better. Thank you. Even though the FAA order requires that even if there is a potential, as in the language of could trigger the need for supplemental EA or EIS, that FAA staff are required to perform a written re-evaluation, this too never occurs. Instead, what we have here are post hoc rationalizations. The FAA acted as though once the Metroplex EA was complete, it was free to do as it pleased without further consideration for the environment. For instance, in March 2017, the FAA implemented a version of Harries I that differed materially from the version that was reviewed in the Metroplex EA. So why? Can I ask? I think this is the crux of a lot of the issues here. Why do you have a timely challenge to that decision? Because you filed a petition for review within 60 days of Harries IV and SLAP II. So why does that allow us to review all the stuff that happened in the earlier orders? Yes, so there are two bases for the timeliness of the petition. One is the reasonableness of filing late in light of the engagement that the petitioner and the City of Los Angeles had with FAA, similar to what occurred in Huerta V, City of Phoenix, where very soon after the initial implementation of Harries II, there were diligent efforts to address the FAA and obtain a change to that procedure. And, in fact, the FAA appeared to be cooperating. Particularly, there were the letters of the ones, Section 175 letters, that were submitted on behalf of elected officials. And there was the engagement with, for instance, Landon and Brown consultants from Burbank. Additionally, soon after that, as a result of the Section 175 letters, there was the roundtable and the task force, the Norse task force, that was developed in which the FAA engaged with all these elected officials and representatives from the various groups in an effort to come to a resolution. But it's fairly, at least not uncommon, for agencies to be hearing comments from the public, maybe even talking to the public about the possibility that they might change their orders. Is it your view that any time the agency is talking to people about its orders, that that sort of structural limitation just keeps going? Certainly not. For instance, in the case of the Huerta case, the question was whether filing a lawsuit would upend that potential for resolution. And the question was, were there indications that there would be some success? And here there were. For instance, in 2018, the FAA had indicated and, in fact, stated in initially preparing a EA to cause those terms from SLAPP to occur much sooner in their own language. Now, that EA still has not been issued. But here there are very concrete steps that are being taken by the FAA. For instance, the task force itself is a fairly substantial engagement. It's not simply a matter of a letter or communication. But I also wish to turn to a second point there, which is a question of an ongoing violation. So here we have an ongoing violation, which is that there are three important aspects of that in this particular instance. The FAA continued to manage actively the airspace. So rather than simply the cases that we've seen cited by the FAA, where there is an action that is discrete and ends, and perhaps there are ongoing consequences to that action, the cases roundly hold that that does not constitute an ongoing violation. In contrast, the cases do note, even though they don't, under the facts of those particular cases, determine that there was an ongoing violation, they consistently note that through threat of all the cases, in an instance in which there is prospective action that is being contested, then there is the opportunity to consider that this is, in fact, an ongoing violation. And here the FAA actually manages the airspace on a day-to-day level, continuing to implement these unlawfully implemented orders. Well, so on that theory, I mean, instead of filing when you did, you could file today or next year, right? Because they're always going to be continuing to implement this and manage the airspace, right? Well, there's something unique to that, Your Honor. But I think the additional aspect here is that, unlike the other cases, in fact the 16-day deadline was met with respect to Harry's 4 and SLAPP 2, and that itself indicated that the FAA was determined to continue to update and implement these unlawfully issued orders from 2017 and 2018. And that action as well would constitute the FAA's determination to operationalize them. But the updating in the order of the Harry's 4 and SLAPP 2, you're not challenging anything that they did by way of, I mean, like the changing land LAS complex to land LAS terminal area, those sorts of editorial changes. You're not saying that there's anything specifically wrong with that, are you? That's correct, Your Honor. What we are saying is that it indicates the FAA's determination to continue to implement actively these unlawful activities. And what I'd like to point out is that the cases that are cited, none of them have this level of engagement. I mean, you can look at, well, all of them. You can look at Preminger was a case in which the decision to prohibit the speech was one that was made a long time ago. If you look at the Isaac Walton League of America case, their decision to allow snowmobiles many years ago, and there's no further engagement from there. If you look at the Central College, University of Hamilton, that, again, they note it's a continuing effects of a speed violation. It's not a situation where there is any ongoing activity or management in that space. So there's a determination not to designate wilderness. The FAA is not involved at the same level in those situations. As is here, where actively every day the FAA is directing these aircraft to fly over that location in which the harms are occurring. So returning for a moment to the central issue of the content of the violation, the FAA plainly was obligated to conduct supplemental review on account of the Metroplex EA having no relevance to the action that took place in 2018 when it issued Harries II. And that's because Harries II added additional aircraft that had not been contemplated by the Metroplex EA. Namely, those are high-performance turbojet aircraft. And that itself is a perplexing decision for the FAA to do because specifically, as noted in the appendix to the EA Metroplex, the purpose of Harries I was specifically to differentiate between turboprop aircraft and jet aircraft on that route so that that route would operate more efficiently. And yet, when additional aircraft were added, and we know from the record that we have in front of us, the number of aircraft is quite significant. In 2018, the FAA reported that there were 4,873 turboprop operations at Van Nuys. And we can look also at Burgenrege, Elwhel from 2019, that also held that the FAA must consider the environmental impact of newly automated flight paths for turboprop aircraft. So, in doing that without any notice, without the opportunity for comment, and no environmental review, it's not surprising that we don't have additional impacts. Moreover, the Metroplex EA noise analysis would predicate on a particular type of aircraft mix, and that aircraft mix changed considerably. So, again, looking to the Metroplex EA appendix, it explains that it was based on the characteristics of the various aircraft, so it's impossible that it would be able to evaluate the considerations that would occur in Harries II, given that the aircraft mix was entirely different. Now, of course, the other two triggers for conducting supplemental environmental assessments are also applicable to Harries II, and that's significant new circumstances, which were not considered in the 2016 EA because they had not happened yet. And the first of those was the January 2017 settlement between the city of Santa Monica and the FAA, which permitted the shortening of the Santa Monica Municipal Airport right away from 3,500 feet to some 5,000 feet, and that resulted in a very extreme curtailment of the number of jet aircraft that could use that runway. Now, what was stated in the Metroplex EA is that airport traffic flows can interact with the other airport traffic flows in different runway operation configurations, and the noise analysis must consider interactions between airports. Now, naturally, those interactions and those runway configurations would be dramatically different, now that one of the closest airports that serves a similar type of aircraft mix is potentially going to be closed by the end of 2029, and specifically in the year in which Harries II was implemented, in fact, had dramatically reduced activity. This corresponded with dramatically increased activity at Van Nuys itself. And, of course, the FAA became aware of new information, namely the southern shift. The departing aircraft were big for flying low, the lower and further field, and loitering longer over the Santa Monica Mountains, which is the same area in which the SLAP and Harry's departure procedures were directing the aircraft. And this is specifically because the Harry's, the waypoint added in Perry to Harry's and other procedures in 2018, directed those planes to make a turn nearly one and a half miles further south than Harry's I, and .69 miles south of where they had been turning under the existing conventional departure procedures. And so clearly looking at those effects combined with what the FAA had became known to them in March and April, at least, of 2018, when they conducted community meetings via Burbank and met with Landrim and Brown consultants in May, must have known that there's a possibility or language of the FAA order could trigger the need for supplemental EA. And yet there was no written analysis whatsoever, which is reflected in the spreadsheet provided by the FAA of their activities. Now, one important element of the continued violation theory is that there is a violation. Now, if you look at the cases that we've discussed, most of them find that there, in fact, was no violation. And here, there plainly was a violation. Turning finally to the impacts that we are seeing in the ongoing way today, this is also plentifully documented in the record. And that is more than a dozen, in fact, dozens of declarations of residents of the Santa Monica Mountains who are experiencing tremors, heart palpitations, sleep disruption, and yet live in areas never historically subject to aircraft impacts. And the Declaration of the Park Manager has further documented pervasive disruptions of the quiet enjoyment of critical section-form of parkland that just serves natural ACs, with thousands of nearby sea dwellers, and a refuge for wildlife. The record also contains UCLA Environmental Pressury Finger's analysis of conspicuous deposits of aircraft-derived toxic particulates. And the case record also includes a full-habitus letter from H.O.A.C.E. and Park Advocates. And so the ongoing harm is plain to see here. Now, I think it perhaps doesn't need to be noted, given where we are, but given that the FAA, in fact, repeats it as many times as it does in the brief, this, all the impacts that have occurred subsequent to the Metroplex EA are due to new circumstances. So Vaughan v. FAA has no relevance to that. Vaughan v. FAA approved the Metroplex EA on the basis of the assumptions in the EA and the facts that were derived there. But when Harry's 2 was altered, and when the circumstances and the location in which those aircraft are flying and the environmental impacts are changing, there's no attack that's occurring here on the Metroplex EA. Can I ask you to go back for a moment to the theory that the FAA's sort of continued engagement and the meetings and the task force and all that meant that the earlier orders weren't final for purposes of special limitations. My understanding is that the FAA rejected the task force's recommendations. I believe it was September 1st of 2020. I mean, why wasn't, even on your theory, why wouldn't that have been the date at which it was clear that the earlier orders were final? Yes, Your Honor. So I would say that what issue we'd have if the filing had occurred in connection with that determination is it may end up in the same situation Los Angeles City was in their suit against FAA that was resolved last year where the determination was that the letters or the communications from the FAA to the city saying we are not making changes to departures that you request, that was determined not to be a final order. So it's not clear to me that, in fact, the statement that the FAA made would, in fact, have been a final order. So what are they, I mean, if issuing, if announcing the procedures isn't final and if saying you've asked us to change the procedures or we're not going to do that isn't final, what do they have to do to, Your Honor, make it be final? I don't mean to say that the orders are not final. I think it's conceded by the FAA and it's clear in the case law that those orders are final. The question is, is there a reasonable basis to approve a late filing? So the question here is what was the activity that occurred leading up to the filing date that did occur? And that filing was timely with respect to Harry's 4 and SLAP 2, which reflected the determination of the FAA not to take into consideration the petitioner's filings, the petitioner's comments, and activity of all the elected officials. You're down to under four minutes if you want to reserve. Yes, I will, Your Honor. Thank you very much. Mr. Masonet. Good morning, Your Honor. And may it please the Court, my name is James Masonet, and I'll be arguing on behalf of the FAA today. Also with me at council table are Courtney Adolph and Kyle Joseph, who were counseled for FAA. Well, so as the Court has suggested, Your Honor, the problem for the petitioners is that jurisdiction here is provided by the Federal Aviation Act, which sets a 60-day statute of limitations for these claims. Many other petitioners challenged the Southern California Metroplex in 2016 when it was adopted. Nine petitions were consolidated for the D.C. Circuit, which rejected all of them and upheld the SoCal Metroplex. Even if we accept petitioners' new theory that what they're really challenging now is the Harry's 2 flight procedure, that still was adopted in 2018, and their petition is still two years too late instead of four. Isn't it true that the so-called Southern shift was not expected to occur but developed and it was not, the FAA said it was not really something they intended or designed to happen, but it has occurred? And so what do you do when there's an agency action and it produces an unanticipated consequence? Well, how do we then apply the deadlines for a petition for review? Because it seems there isn't a new final order. And so it would seem that how do you raise that issue and get it before a court? So the short answer is, Your Honor, is that jurisdiction under the Federal Aviation Act is tied to the orders. They have to file their petition within 60 days of the order. So the question is what if new circumstances arise later? This is related to their new claim, which they have advanced for the first time in their reply brief, that the FAA is required to supplement its NEPA analysis from the detailed environmental assessment that they did in 2016 for the SoCal Metroplex to address these allegedly new circumstances. But how does the problem get resolved in your view? Is it that we should, you know, suppose there's a genuine new circumstance that's a, you know, unanticipated major consequences, something that if it had been thought of, it should have been considered. So there's two possibilities. One is that, you know, the court looking at the reasonable grounds language would say, well, that's reasonable grounds for coming in late because nobody thought about the issue, and then here's the challenge. The alternative would be that you're supposed to go back to the agency and get some kind of a final decision on the new factor, and then within 60 days come to the court. Which of those do you think is the right way to handle an unanticipated issue under the statutory framework? So short answer is the latter, Your Honor. I think there are two issues that tend to get conflated and weave together here, right? One is the question of the statute of limitations and whether there are new circumstances later that raise potential new challenges to an order, but after 60 days. And then the separate question is this new argument that they've advanced, that the FAA, regardless of whatever happened, is now obligated to supplement its analysis under the National Environmental Policy Act. And the legal standards there are a little distinct, but the short answer to your question is, if new circumstances arise, they are still time barred by the law, by the express statement in the Federal Aviation Act from challenging the original Harry's, the original SLAP, or Harry's II. But what they can do is they can take the declarations that they've compiled with their briefs, the studies that they've compiled, and they can petition the FAA for change. They can say, look, you need to look at these studies, and based on them, you should amend Harry's and SLAP to turn earlier so they turn over the Ventura Freeway and don't penetrate above the neighborhoods where our members live. The FAA will review that information. It will make a decision. It may deny that petition. It may say, we're not going to do that. That will be a new decision point. And then they can challenge that. That's not a decision. Does it have to be a formal petition, not some kind of an informal process? Yeah, I mean, I think they need to send a letter in, and they need to formally ask the FAA to amend those flight procedures, yes. I think that would be the way to proceed. And then they can bring a new challenge based on that. What they can't do is reopen decisions that were made in 2016 and 2018, because, of course, the question here, we're applying the standards of the Administrative Procedure Act, and the question is not did the FAA perfectly predict the future and anticipate every possible consequence of its actions. That's not what the law requires. The APA requires the FAA to make rational decisions based on the administrative record that was before it, and the National Environmental Policy Act requires the FAA to ensure that it is informed about the potential environmental consequences of those actions when it makes its decision. But the FAA was not required to perfectly predict the future, because obviously if that were the standard for whether its decision to issue these orders was rational, well, I mean, no agency could ever meet that standard. There may always be some future consequence that was unanticipated. The question is did they reasonably look at what was happening? Did they make reasonable estimates of aircraft noise over these neighborhoods? And I would submit that they did. As we explained in our brief, the FAA did anticipate that craft flying the Harry's and SLAP flight departure procedures would go further south. They would go south of Ventura Freeway. They would fly over the neighborhoods where the petitioner's members live, and they were not the only ones, right? Benedict Hill's Estates Association also anticipated that. They submitted comments in 2015 that raised the same issues that the petitioner is now raising today. They said, look, you look at these diagrams. We've taken the maps the FAA produced, and we can see that these flights are going to come further south. They're going to fly over our neighborhoods, and we don't want that. They submitted timely comments in 2015. You can see essentially the same diagrams that Benedict Hill submitted in 2015 that petitioner now argues whether in our brief or post hoc rationalizations. You can see them in the supplemental excerpts of record at page 93. And then, of course, after the SoCal Metroplex was adopted, Benedict Hill's filed a timely petition for review. So I dispute the idea that this southern shift was entirely unanticipated and represents new circumstances. Your Honor, the petitioner has tried to invoke them. So there is, of course, an exception to the 60 days, the reasonable grounds exception. And the petitioner has tried to invoke that, and they have mainly relied on the D.C. Circuit decision, the city of Phoenix being aware of that. They've said, well, the FAA has been engaged with us and with others, and so that means that really wouldn't have been reasonable to file. I think this case is not like the city of Phoenix. I would submit, of course, that this court is not bound by the city of Phoenix. I think that the dissent in that case has the better reasoning. But even if we accept that the city of Phoenix is good law, I mean, first of all, it only found reasonable grounds for six months in play, not for two years or for four years. But more importantly, the facts here are nothing like the facts were in the city of Phoenix. In the city of Phoenix, what the court found was that the FAA had made serial promises to the petitioners. We're going to work this out. Every month, the court goes through. In January, they said this. In February, they said this. In March, the FAA said this. Here, the FAA has never promised to replace Harry's or SLAP or the Perry Waypoint, and none of the petitioner's sites show otherwise. If you walk through that part of their brief where they say, look, here's continuous engagement, there's fundamentally only one site to something that the FAA said. This is if you had an extra record document, that they have a number ANR 38-39, and what it is is it's two slides from a PowerPoint presentation where the FAA attended and went to a meeting, and in their presentation they did not affirmatively promise the petitioners they were going to replace these procedures. What they said was, here's a summary of what you've asked us to do. It's a summary of VAWA's request to potentially replace the Perry Waypoint. That's not the kind of serial promise that the court found in the city of Phoenix was enough to be reasonable grounds for delay. So, you know, as you go through step by step. So, for example, Harry's 2 was adopted on May 24, 2018. They filed their petition November 9, 2020. So that's two and a half years of delay that they have to find reasonable grounds for. All right, first they say, well, Harry's 2, we only learned about it in November 2018. Let's say that was reasonable grounds to delay until November 2018. You've still got about two years to explain. They don't say that the FAA promised that they would replace Harry's in November 2018. Instead what they say is, well, then we started to work with others on a letter to the agency. So from November 2018 until that letter goes out in March 2019, they're saying that the fact that they were working on a letter to the agency is enough to toll the statute of limitations. No court has ever found that to be reasonable grounds. They were on notice from the statute of limitations that there's a 60-day statute of limitations here and their claims could be time-barred if they didn't file promptly. Instead, they spent four months working on a letter. Then in July 2019, they say the FAA agreed to participate in a task force. Again, this is not like the kinds of serial promises that the D.C. Circuit found in the city of Phoenix were enough to toll the statute of limitations. It's not one of these other cases that we said in our brief where the FAA said, oh, you don't need to worry about that order because we're going to replace it. All the FAA did here was agree to participate in a task force. And as the courts already pointed out, that went on, that process, those discussions went on until September 1, 2020, at which point the FAA said, we don't think this is going to work. At that point, they were on notice that, at the very latest at that point, they were on notice that if they had complaints about Harris II, they needed to file their petition. And yet still they waited. They waited more than 60 days. It's only about a week late at that point, but they still waited. So the case, the FAA, of course, continues to be engaged with interested parties, the airports, communities, to try to make this system work better for everyone. But that in and of itself is not enough to toll the statute of limitations. Congress has imposed an explicit six-day statute of limitations here to ensure that these claims get heard quickly so that airports and airlines and pilots can rely on these procedures. I'd like to address a bit the new argument they've made that we need to supplement the environmental assessment to address significant new circumstances. Now, petitioners waive that argument. You can look in their petition for review. You can look in their opening brief, and you won't find it. It's raised for the first time in their reply brief. The court shouldn't consider it. But assuming the court does consider it, this is essentially an argument that they should have done further environmental analysis before they adopted Harry's 2, which put the priority waypoint back in. Again, those claims are still time-barred. They matured in 2018, and the petitioners didn't file them until 2020. Beyond that, the argument fails because the FAA does not have an ongoing obligation to update its environmental assessment here for the SoCal Metroplex because federal action here is complete, and no major federal action remains to occur. The point of NEPA is to inform agency decision-making. Once the agency makes its decision, NEPA obligations end. Here, the FAA made its decision. It adopted these orders, and that was the end of the NEPA process for Harry's and SLAP, for the SoCal Metroplex, and for Harry's 2. And you can see that in NEPA's regulations. That 40 CFR Section 1502.9d, which expressly states that agencies only require to supplement. So suppose there is a genuinely unanticipated, very significant consequence, and they then file a petition and say, we're going to do something about this, and then the agency says no, and then within 60 days they file a petition so that it would be timely. Is it your position that, substantively, they would lose because there's no obligation to do anything in response to the new circumstance? If they're arguing for NEPA supplementation, there would be an independent obligation for the FAA to make a rational decision on their petition to, say, for example, ask the FAA to amend the Harry's and SLAP departure procedures. There would be an independent obligation to make a rational decision on that. Whether they have to supplement the EA, and whether or not they have to amend the flight procedures are distinct legal questions, one governed by the APA and one governed by the standards of NEPA. But on NEPA, if they sent in a petition now that says we want you to supplement NEPA for the SoCal Metroplex, where the orders were filed in 2016, that's right, there would be... There's no major federal action left to occur, and so that's the end of the NEPA obligation. And you can see that in the Supreme Court's decision in Marsh v. Oregon Natural Resources Council, which is at 490 U.S. 360 at page 374, where they hold that it's only required if there's major federal action left to occur. Beyond that, I mean, you know, in that case, in Marsh, of course, the issue was the Corps had to build a dam and it had built a third of the dam, and it still had two-thirds of the dam left to build. And new environmental information came up, so it had to prepare some sort of supplemental NEPA analysis. Here, the FAA implements these orders, and then it doesn't fly these routes. These are the procedures. That's the end of the FAA's involvement. Beyond that, Your Honor, I would dispute, even if there were some ongoing federal action here, there's a second prong to this, right? You don't have to prepare supplemental NEPA analysis every time there's new information, because otherwise agencies would never be able to make a final decision. It has to be significant, right? And the petitioners raise a variety of issues, and none of them, they have not provided evidence to show that any of these issues are significant, right? So we have, for example, the sort of confused history of whether or not turboprops can fly the Harry's flight departure procedure. But what they haven't shown is that the fact that some turboprops are flying this flight procedure makes any difference to aircraft noise or to environmental impacts. It's certainly not self-evident that it does, and they haven't cited any evidence in the record that suggests that it does. So even if this were new information, it's not clear that the FAA would have to prepare any kind of supplemental analysis. Similarly, they argue that the runways were shortened at the Santa Monica airport, and they conclude from this that, well, that must mean that more planes are going to Van Nuys and Burbank. But again, that's just their speculation. They haven't shown any record evidence showing that air traffic at Van Nuys or Burbank has increased or has increased in a way that the FAA didn't anticipate when it prepared its original environmental assessment. Again, they say, well, this other shift is new information. But, you know, as we've explained in our briefs, the FAA anticipated that some flights would be penetrating further south of Ventura Freeway, and they made that information public. And, you know, some groups, like the Benedict Hills States Association, recognized that and sent detailed comment letters addressing it. I guess I should mention, they say that, you know, what we did in our brief, we included these diagrams that show that the flight paths may go south of the freeway into the neighborhoods where the petitioners live. They say that's a post-hoc rationalization. It's not. Those diagrams were generated using the tools and the data that were available to the public, and that the FAA relied on in 2015 and 2016 when they adopted the SoCal Metroplex. You can download it yourself and load up Google Earth, and you can check the Harry's and the SLAT flight procedures, and you'll see the same 3D models. All we did was print out a specific picture of them. And, you know, I can prove that because Benedict Hills, when it submitted comments in 2015, submitted essentially the same diagrams. And you can see those at the supplemental excerpts of Record 93. They said, hey, look, this is showing flight routes going further south. So, in short, Your Honor, the petitioners waived these supplementation arguments. They're still time-barred. It even doesn't require the FAA to supplement its environmental analysis at this stage because it's already made its decision. And, you know, that doesn't mean that the FAA will never consider this information. As we've already discussed, they can package this up, they can submit it with a formal position, and we'll get to a new agency decision. And if they don't like it, they can challenge that. May I ask you a question about the changes reflected in Harry's 4 and SLAT 2? It seems to be common ground that those are, of course, non-substantive editorial changes. But I was just wondering if you can tell us what they mean. And this is just out of curiosity. Like the land LAS terminal area and the NY Tower of Communications, why are those added? As you may have noticed, Your Honor, some of this is very technical, and it's not always completely opaque to those of us who are not FAA engineers. My understanding is that those editorial changes were made to make the flight procedures more consistent with the Las Vegas Metroplex, which was adopted somewhere along the way, and they wanted to make the text of the orders consistent. And that's my understanding. And then sort of a related question, these designations, you know, Harry's and SLAT, are those purely arbitrary labels? Or do they have some meaning? As they are, my understanding is they're purely arbitrary, that they have a VAT of them somewhere, and when they need a new waypoint name, they pick them out of the VAT. So this is how JT ended up turning into Perry, because JT was used somewhere else. So, I mean, the long and the short of it, in conclusion, Your Honors, is that the petitioners waited four years from the SoCal Metroplex, two years from Harry's, too. It's too long. The statute of limitations has run. Congress has laid out a clear policy here, and that is that it is too late. Now, it doesn't mean that the FAA is ignoring the petitioners' concerns. The agency is working right now with stakeholders throughout Southern California to make this system work better for everyone. But there are no easy solutions, right? The changes that the petitioners have asked you to make here are only going to shift aircraft noise from their neighborhoods to someone else's neighborhood. That's not a solution. The only solution is for the technical experts at the FAA to keep working with affected communities, with the airports, the airlines, municipalities, to try to find a better balance. And for all those reasons, Your Honor, their petition should be denied. Thank you, Counsel. Mr. Strauss, you have just under four minutes remaining. Thank you, Your Honor. Counsel, the FAA asserts that the arguments raised in the reply brief are new and therefore barred and waived, being that they were not raised in the same form in the opening brief. However, the opening brief clearly argued that Harries 2 and SLAP 1 were new procedures. In response to that argument, in the answer of the FAA, the argument was made that, in fact, they were covered by the EA. Had they not been covered by the EA, there would be no reason to move forward with the supplementation argument. But given that the FAA contends that they are, in fact, covered, there's a need to address that argument. And one aspect or one way to look at the procedures is that they are, in fact, new. And what we've heard right now is that the FAA does not, in fact, dispute that there are new types of aircraft allowed on that ground than there were previously. So if it is new, there's no reason to relate it to the EA. If, in fact, it's a modification of that procedure, then it is now necessary to explain why supplementation is required. It is plain that there is no question whether the FAA was imperfect in predicting the future in the EA. It's simply a matter of the FAA affirmatively making changes to the procedures, not errors in their ability to prognosticate. They, for whatever reason, in Harries 2, decided to add additional aircraft that were not previously eligible. The FAA entered into a settlement agreement with Santa Monica, which itself changed the surrounding environment. These are not questions of anticipation or unanticipation, but questions of the affirmative actions of the FAA. In fact, the FAA's changes are not a matter that the petitioner has an obligation to establish affirmatively and definitively will have certain effects. Rather, the entire purpose of NEPA and Section 4F, as explained in Marsh, is a requirement to continue to maintain a hard look at those consequences. And the reason why there isn't the record that exists is because the FAA failed to take that hard look and generate that material that should be in the record or should exist. And there's assessing what impacts would transpire from those affirmative changes that the FAA made. Now, the language of the FAA order itself gives us the answer, which is the language of an event that there could be an effect. There's an obligation to our written re-evaluation, which never occurred. Additionally, this case is very similar to the City of Phoenix, in that there was continuous assertions from the FAA that there would be steps taken to resolve the matter. It's not a question, if you read the City of Phoenix, that those are specifically promises, but rather that the engagement, which is productive, will be upended. And there was naturally the same concern here that litigation on the part of one actor in this network and in the roundtable discussion and in the task force would, in fact, upend that participation. I also wish to point out that in a number of cases relating to questions of APA timeliness and a reasonableness thereof, the appellate court has offered the opportunity to provide supplemental briefings if there is any uncertainty about that reasonableness relative to the record, and I believe that would be appropriate here as well. And therefore, I wish to use the remaining few seconds simply to point out that it is the FAA's obligation in an ongoing manner to manage the airspace. It's not a question of the FAA simply walking away from it, but the FAA on an active basis is implementing these procedures for which endowment analysis was conducted. Thank you, Your Honors. Thank you, both counsel, for their helpful arguments this morning. The case is submitted.
judges: MILLER, COLLINS, Korman